UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CIVIL ACTION NO.: 5:05CV253-V

| | |
|---|---|
| **R.J. Reynolds Tobacco Company,** ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> **Market Basket Food Stores, Inc.,** ) <br> **et al.,** ) <br> Defendants. ) <br> ) | **Memorandum and Order** <br> Denying Defendants' Motion To Abstain |

**THIS MATTER** is before the Court on Defendants Appalachian Oil Company ("Appco"), Daniel Blackburn, and Jeffrey Benedict's Motion To Abstain, filed November 8, 2005. (Document #123) Plaintiff R. J. Reynolds Tobacco Company ("R.J. Reynolds" or "RJR") filed a memorandum in opposition on December 19, 2005.[1] (Document #157) Defendants submitted a reply on December 30, 2005. (Document #160)

Appco, Blackburn, and Benedict (collectively, the "Appco Defendants"), along with others, also move for dismissal of certain claims against them pursuant to FED. R. CIV. P. 12(b)(6), namely, Plaintiff's federal and state law racketeering claims. The motions to dismiss will be addressed in a separate order.

---

[1] Plaintiff obtained an extension of time to respond to Defendants' motion. (Document #147)

1

## I. Background / Related "Tennessee Action"[2]

R.J. Reynolds, a North Carolina corporation, is the second largest manufacturer of cigarettes in the United States. (RJR's Compl., ¶17 ) (Appco's Compl., ¶7) Appco, a Tennessee corporation, operates a chain of convenience stores in Northeast Tennessee, Southwest Virginia, and Eastern Kentucky. (RJR's Compl., ¶27; Appco's Compl., ¶6) Jeffrey Benedict is the President of Appco. (RJR's Compl., ¶28) Daniel Blackburn is Appco's President of Convenience Store Operations. (RJR's Compl., ¶29)

Appco alleges that it has purchased RJR cigarettes through certain wholesale grocers for over twenty-two years. (Appco's Compl., ¶9) More recently, Appco's and RJR's business relationship has been governed by a series of marketing contracts referred to as "Retail Partners Marketing Contracts" ("Marketing Contracts"). (*See* Exhibits A and B to Appco's Complaint; Exhibit A to RJR's Answer & Counterclaim)

RJR and Appco operated pursuant to Marketing Contracts from January 1999 through June 11, 2004,.[3] (RJR's Compl., ¶225) The terms of the Marketing Contracts required Appco to follow RJR's relatively stringent guidelines with respect to point-of-sale marketing of RJR brands. In exchange, Appco received discounted (or "bought-down") RJR product and was eligible for other

---

[2] Citations to the record include references to Appco's Complaint filed in a related action pending in the Circuit Court for Sullivan County, Tennessee, *Appalachian Oil Co., Inc. v. RJ Reynolds Tobacco Co and Kerry Sizemore, Civil Action No.: C3146;* R.J. Reynolds' Answer and Counterclaims, filed in the same Tennessee action; Appco's Answer to R.J. Reynolds' Counterclaims; R.J. Reynolds' Verified Complaint in the federal action before this Court; the official transcript of the preliminary injunction hearing held on November 16, 2005; and the parties' respective legal memoranda in support of, or in opposition to, the instant motion for abstention.

[3] The only contracts between RJR and Appco that are part of the existing record are for the years 2003 and 2004. RJR alleges that the 2003 Pack Outlet Plan Agreement is representative of the contracts governing the parties' relationship during the relevant time period. (RJR's Countercl., ¶13)

monetary rewards or incentives. As described by RJR, "[u]nder the buy-down program, retailers that have agreed to participate in R.J. Reynolds' overall marketing plan, and with whom R.J. Reynolds has entered into marketing contracts, receive per-carton discounts, or "buy-down payments," from R.J. Reynolds on certain brands of cigarettes that have been selected for promotion. The retailers, in turn, are contractually obligated to pass these buy down payments on to adult consumers as discounts." (RJR's Countercl., ¶1)

Retailers who choose not to participate in RJR's Buy-Down Program are not entitled to purchase bought-down RJR cigarettes and are expected to pay full-price. (RJR's Countercl., ¶3; RJR's Compl., ¶225) The Marketing Contracts expressly prohibit selling bought-down cigarettes to other retailers or wholesalers.[4] (RJR's Countercl., ¶20; RJR's Compl., ¶225) Thus, the purported advantage of the Buy-Down Program to Contracted Retailers is the ability to offer discounted RJR product to its customers which, in turn, allows the retailer to compete more effectively with other retail convenience stores and, presumably, increase its overall sales. (RJR's Countercl., ¶¶2, 17)

For purposes of the Buy-Down Program, Appco was considered a "third-line retailer." (RJR's Countercl., ¶¶5,6,14) Appco's third-line retailer status meant that Appco had been designated by RJR as a retailer eligible to purchase bought-down RJR cigarettes from wholesalers in contract with RJR.[5] (RJR's Countercl., ¶¶5,6, 14) As applied to Appco, Plaintiff's "Buy-Down

---

[4] One mechanism for enforcement of this provision in the Marketing Contracts was RJR's ability to audit participating retailers to determine compliance. (RJR's Countercl. / Exh. A, at 3.)

[5] RJR offers a similar program to certain wholesalers whereby wholesalers wishing to distribute bought-down RJR product must be in contract with Plaintiff. (RJR's Countercl., ¶4) Wholesalers participating in RJR's Wholesaler Partners Program receive RJR cigarettes at the lowest available wholesale price and also receive compensation from RJR if they provide certain volume and sales information for statistical analysis as directed by RJR. Id. RJR uses the statistical analysis to implement its Buy-Down Program. Id. RJR alleges that Appco's wholesaler was in contract with RJR during the relevant time period. ( Id., ¶14)

Program" worked in the following manner: Appco purchased the product at the bought-down price and then the wholesaler was the entity reimbursed by RJR.[6] Thus, the discount was applied by the wholesaler rather than the retailer. (RJR's Countercl., ¶6) According to RJR, whether paid directly to the retailer or indirectly via a third-line discount, RJR's buy-down payments always have been contingent on the participating retailer's satisfaction of all of its contractual obligations. (RJR's Countercl.,¶19).[7]

This dispute involves Appco's participation in RJR's "Buy-Down Program." During 2003, RJR became suspicious that Appco was selling bought-down RJR cigarettes to non-participating retailers or wholesalers and misappropriating or diverting some or all of the buy-down discount to themselves or others as opposed to the individual consumer. (RJR's Countercl., ¶7; RJR's Compl., ¶231) RJR alleges that Appco accomplished this by placing "special orders" for bought-down cigarettes never intended for consumer sales in Appco stores. (RJR's Countercl., ¶¶23-25) In March 2004, after noticing spikes in the volume of Appco's sales, RJR initiated an audit of Appco. (RJR's Compl., ¶231-33; Appco's Compl., ¶18) The final results of the audit were made available to Defendant Blackburn on January 7, 2004. (RJR's Compl., ¶234) The audit allegedly confirmed RJR's suspicions. (RJR's Compl., ¶234) According to RJR, when confronted by RJR employees with audit results, both Blackburn and Benedict admitted that Appco was selling bought-down product to a retailer or wholesaler that was not in contract with RJR. (RJR's Compl., ¶¶234, 237)

---

[6] Typically, retailers are required to purchase RJR product from wholesalers at full price and then request the appropriate buy-down payment directly from RJR. (RJR's Countercl., ¶¶6, 18)

[7] RJR discontinued its third-line discounting practice in Fall of 2003. (RJR's Countercl., ¶19)

RJR claims that Blackburn refused to disclose to whom Appco was selling RJR bought-down product. (RJR's Compl., ¶¶234, 236)

In April 2004, RJR notified Appco that it considered Appco's actions to be in violation of the Contracts, demanded repayment from Appco, and threatened legal action. (RJR's Compl., ¶237) (RJR's Resp., Exh. #1 / 5-28-04 Letter to J. MacLean) RJR also began to withhold marketing payments at that time.[8] (RJR's Exh. #1, at 3.) Appco alleges that due to RJR's withholding of payments under the contract, Appco was "forced to stop purchasing RJRT cigarettes under contract and to seek an alternative source of supply." (Appco's Compl., ¶20)

According to RJR, in May 2004, Appco was informed that it was no longer eligible to receive buy-down payments. (RJR's Compl., ¶238) Blackburn allegedly informed RJR that it had begun its search for another source of bought-down product. (RJR's Compl., ¶238) In June 2004, Blackburn reportedly would not confirm or deny whether Appco had begun to purchase bought-down cigarettes from an unauthorized wholesaler. (RJR's Compl., ¶¶238-39) RJR terminated its contract with Appco on June 11, 2004. (RJR's Compl., ¶238)

RJR further alleges that once Appco could not purchase bought-down RJR cigarettes pursuant to the Marketing Contracts, Appco's role as supplier of bought-down cigarettes changed to that of a purchaser. According to RJR, "Appco paid conspiring retailers and wholesalers (1) a price for the "special order" cigarettes that was lower than the non-discounted wholesale price, but higher than the bought-down price; or (2) the bought-down price to which Appco added its profit margin before reselling the bought-down product to its customers." (RJR's Countercl., ¶¶27-30)

---

[8] Appco claims that RJR withheld as much as $169,000.00. (Appco's Compl., ¶18)

On September 22, 2004, Appco initiated an action in Tennessee state court against RJR and Kerry Sizemore, an RJR Account Manager responsible for Appco's account.[9] (*See Appalachian Oil Co., Inc. v. RJ Reynolds Tobacco Co. and Kerry Sizemore*, Circuit Court for Sullivan County, Tennessee, Civil Action No.: C3146)(RJR's Compl., ¶237) Appco alleges in its Complaint that RJR was aware and approved of Appco's actions with respect to the purchase or sale of bought-down cigarettes. (Appco's Compl., ¶¶14-16) In support of this claim, Appco alleges that on two different occasions, Appco inquired about RJR's position on sales to customers for resale. (Appco's Compl, ¶¶14, 16) Appco alleges that in June 2002, Kerry Sizemore provided "implied or express assurances that RJRT benefitted from such sales and would not discourage them." (Appco's Compl., ¶14) Appco further alleges that in or around November 2003, Sizemore, on behalf of RJR, again advised Appco that RJR benefitted from these sales and did not object. (Appco's Compl., ¶16)

Based upon these allegations, Appco seeks a declaratory judgment from the Tennessee court 1) that Appco is in compliance with the Contracts; or 2) that RJR waived any purported restrictions on sales contained in the Contracts; or 3) that RJR is estopped from enforcing any restrictions on sales within the Contracts. (Appco's Compl., ¶¶23, 24) Tenn. Code Ann. §29-14-104. In addition to seeking a declaratory judgment, Appco advances claims alleging unfair and deceptive trade practices under the Tennessee Consumer Protection Act, Tenn. Code Ann. §§47-18-104(b)(12) and (27),. (Appco's Compl., ¶¶25-29) Appco seeks both declaratory and injunctive relief under Section 47-18-109. (Appco's Compl., ¶25) Appco also asserts RJR's conduct constitutes a breach of the implied covenant of good faith and fair dealing. (Appco's Compl., ¶¶30-32) Specifically, Appco contends that even if Appco were found to be in breach of the Marketing Contracts, RJR withheld

---

[9] Sizemore is no longer a party to the Tennessee action. (RJR's Countercl., Exh. D)

more money that it was entitled to under the terms of the contracts. (Appco's Compl., ¶¶18, 27, 31)

RJR answered Appco's declaratory judgment action on November 15, 2004. (Document 129, Exh. C / RJR's Answer & Countercl.) In response to Appco's allegations, RJR filed multiple counterclaims pursuant to Tennessee law. Specifically, RJR alleges that Appco breached the following terms of its marketing contract: 1) its agreement not to "buy, sell or trade promoted or discounted product with other retailers or wholesalers"; and 2) its agreement "to pass 100% of all RJRT buydowns on to adult consumers." (RJR's Countercl., ¶¶1-46) RJR's second counterclaim alleges fraud by Appco via its alleged abuse or manipulation of the Buy-Down Program. (RJR's Countercl., ¶¶1-52) RJR's third and fourth counterclaims allege inducement of breach of contract in violation of Tenn. Code Ann. §47-50-109 and Tennessee common law, respectively. RJR alleges that Appco knowingly, intentionally, maliciously, and with ill will, procured the breach of RJR's contracts with other wholesalers and retailers by inducing Appco's wholesaler to report inaccurate information to RJR and provide improper third-line discounts. (RJR's Countercl., ¶¶1-66) RJR alleges that after Appco lost the ability to purchase bought-down product legitimately, Appco began inducing other retailers to sell bought-down cigarettes. (RJR's Countercl., ¶56) RJR's fifth claim alleges unfair and deceptive trade practices in violation of the Tennessee Consumer Protection Act, Tenn. Code Ann. §47-18-101, *et seq*. (RJR's Countercl., ¶¶1-71) RJR's sixth claim alleges civil conspiracy in violation of Tennessee common law, namely, Appco's alleged efforts to procure the breach of the Marketing Contracts RJR held with Appco and its co-conspirators. (RJR's Countercl., ¶¶1-78)

The Tennessee action remains pending. Discovery is underway but not complete. Appco filed a motion to compel in September 2005 and represented in its filing that it was still receiving

documents from Plaintiff RJR that it originally requested in December of 2004.[10] Appco also sought documents from its former RJR wholesaler, H.T. Hackney. Reportedly, there was a technical defect with respect to the document subpoena that neither party has attempted to cure. Daniel Blackburn was deposed by RJR in May 2005. The deposition of Kerry Sizemore was scheduled to occur immediately following Blackburn's deposition but the parties ran out of time. The Sizemore deposition has not been rescheduled. According to Appco, Sizemore's deposition has not been rescheduled due to the need to secure all of RJR's document production in advance of the deposition. Aside from the motion to compel, which was ultimately resolved amongst the parties, there has not been any motions practice. According to the Appco Defendants, the Tennessee action could be ready for trial as early as Spring / Summer 2006. However, neither party represents that a dispositive motions deadline or an actual trial date (or trial term) has been set.

## II. Nature Of Federal Case

On September 23, 2005, Plaintiff RJR filed its Verified Complaint alleging twenty-one (21) different causes of action against twenty (20) individual and corporate Defendants.[11] Plaintiff's Verified Complaint alleges multiple violations of the federal and North Carolina racketeering statutes as well as state law claims including unfair and deceptive trade practices, fraud, breach of

---

[10] The parties proffer different explanations regarding the posture of the Tennessee action generally and the circumstances surrounding the motion to compel. Although Defendants do not accuse RJR of bad faith, Defendants criticize RJR's "tactics" and imply that RJR's slow discovery production in the Tennessee action is the result of its preparation "to open its second front" in this federal court. RJR contends that Appco's delay in responding to correspondence regarding a protective order contributed to the delay in production of document discovery. RJR also indicates that between late 2004 and early 2005, the parties entered into confidential settlement negotiations and reached an oral agreement to suspend document discovery during this time period. (RJR's Mem. In Opp., at 4; Exhs. 2-4)

[11] There are only 18 Defendants in the case now because Plaintiff voluntarily dismissed its claims against Defendants James Crump and BCW Properties, Inc., d/b/a Holiday Foods, on December 12, 2005. (Document #155)

contract, tortious interference with contractual relations, and civil conspiracy.[12]  In addition to monetary damages, Plaintiff seeks injunctive relief against certain "Core Defendants."  The Appco Defendants are each identified by Plaintiff as among this group of "Core Defendants."

This federal action is in its early stages.  Although RJR's Verified Complaint was filed in September 2005, it took approximately four to five weeks for Plaintiff to effect service on the Defendants.  On November 16, 2005, the Court presided over an all-day evidentiary hearing to address RJR's motion for preliminary injunction.  The Court took RJR's request for injunctive relief under advisement.  In addition to the motion to abstain, there are multiple Rule 12(b) motions pending.[13]

On January 4, 2006, the parties participated in an initial attorney's conference.  On January 11, 2006, the parties filed a Joint Certification and Report of Initial Discovery Conference indicating that they were unable to reach agreement on a case management plan or pretrial scheduling order. (Document #170)  The Appco Defendants, and another defendant group, seek a stay of discovery pending resolution of the dispositive motions.  The Court will not issue a Pretrial Case Management and Scheduling Order until the pending motions are disposed of.

---

[12] In Counts 1 - 9, Plaintiff alleges civil violations of RICO pursuant to 18 U.S.C. §1962(c) / Pattern Of Racketeering Activity. Count 10 alleges violations of 18 U.S.C. §1962(a) / Receipt Of Income From Racketeering Activity.  Count 11 alleges Defendants conspired to violate the federal RICO laws, 18 U.S.C. §1962(d).  Counts 12 - 16 allege violations of North Carolina's RICO statute, N.C. Gen. Stat. §§75D-4(a)(1) - (3) / Participation In Pattern Of Racketeering Activity Through Enterprise, Engaging In Racketeering Activity Or Acquiring Interest In Proceeds From Racketeering Activity, and RICO Conspiracy.  Count 17 alleges unfair and deceptive trade practices pursuant to N.C. Gen. Stat. §75-1.1.  Count 18 alleges common law fraud.  Count 19 alleges breach of contract.  Count 20 alleges tortious interference with contractual relations.  Count 21 alleges a civil conspiracy.

[13] Because the Court's rulings on the dispositive motions have some bearing on the propriety of issuance of the preliminary injunction sought by RJR, the undersigned declined to issue its Memorandum and Order in advance of the other rulings.

## IV. The *Colorado River* Abstention Doctrine

As a general rule, "our dual systems of federal and state governments allow parallel actions to proceed to judgment until one becomes preclusive of the other. Chase Brexton Health Serv., Inc. v. State of Maryland, 411 F.3d 457, 462 (4th Cir.2005). "Despite what may appear to result in a duplication of judicial resources, '[t]he rule is well recognized that the pendency of an action in the state is no bar to proceedings concerning the same matter in the Federal court having jurisdiction." Chase Brexton, 411 F.3d at 462 (*quoting* McLaughlin v. United Virginia Bank, 955 F.2d 930, 934 (4th Cir.1992)(*internal citation omitted*)). Rather, the remedy is to turn to principles of *res judicata* and collateral estoppel in order to minimize any potential inefficiency. McLaughlin, 955 F.2d at 936.

The *Colorado River* Abstention Doctrine recognizes that in certain circumstances, it may be appropriate for a federal court to refrain from exercising its jurisdiction to avoid duplicative litigation, but such abstention is the exception rather than the rule. Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 813 (1976). Indeed, federal courts are bound by a "virtually unflagging obligation . . . to exercise the jurisdiction given them." Gannett Co., Inc. v. Clark Constr. Group, Inc., 286 F.3d 737, 741 (4th Cir.2002) (*quoting* Colorado River, 424 U.S. at 817; and Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 716 (1996)). *Colorado River* tasks the federal court *not* with determining whether it should *exercise* jurisdiction, but with ascertaining whether "exceptional circumstances," or "the clearest of justifications" justify the *surrender* of federal jurisdiction. McLaughlin, 955 F.2d at 934 (*quoting* Moses H. Cone Mem.'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 25-26 (1983)).

Application of the *Colorado River* doctrine is more limited than traditional abstention doctrines founded on principles of federalism, constitutional issues, or comity. *See generally*, Eric C. Surette, J.D., When Are Proceedings Parallel So As To Permit Federal Court Abstention Under Colorado River Water Conservation Dist. v. U.S., 424 U.S. 800 (1976), 176 A.L.R. Fed. 517 §2(a) (2005); Chase Brexton, 411 F.3d at 463. Instead, *Colorado River* is employed "solely as a matter of judicial administration . . . giving regard to conservation of judicial resources and comprehensive disposition of litigation." Chase Brexton, 411 F.3d at 463; Moses H. Cone, 460 U.S. at 28. For this reason, the Supreme Court cautions that the *Colorado River* doctrine is to be applied "parsimoniously" or sparingly. Id. (*quoting* Colorado River, 424 U.S. at 818.)

"For a federal court to abstain under the *Colorado River* doctrine, two conditions must be satisfied. As a threshold requirement, there must be parallel proceedings in state and federal court." Gannett, 286 F.3d at 741; Colorado River, 424 U.S. at 813; Al-Abood v. El-Shamari, 217 F.3d 225, 232 (4th Cir.2000) (*citing* New Beckley Mining, 948 F.2d at 1073). Second, "exceptional circumstances" warranting abstention must exist. Id.

## V. Discussion

This federal cause of action is not "parallel" to the Tennessee action as contemplated by *Colorado River*.[14] "Suits are considered parallel if substantially the same parties litigate substantially the same issues in different forums." New Beckley Mining, 948 F.2d at 1073. The

---

[14] It is significant to note the difference between *Colorado River* analysis involving federal and state proceedings versus analysis involving two federal actions. Gannett, 286 F.3d at 748. If the Tennessee action were pending in the federal district court, Defendants' legal position would be much stronger.

most obvious problem with finding the two lawsuits parallel is the breadth of the instant federal action.

R.J. Reynolds names 17 more defendants in the federal action than exist in the Tennessee action. In addition, Daniel Blackburn and Jeffrey Benedict, individuals key to resolving the claims between RJR and Appco, are not parties to the Tennessee action.[15] Arguably, Blackburn and Benedict have litigation interests that are substantially similar to Appco's. The same cannot be said for the 15 individuals and entities RJR has named as defendants in this action. The parties are not "substantially similar."

Likewise, the issues raised are not "substantially similar." According to Defendants, RJR's counterclaims are based on virtually the identical allegations within the Verified Complaint in the federal action. (Defs.'Opp. Brf., at 5-6.) The Court does not dispute that many, if not all, of the underlying factual allegations are the same. Yet, the federal action includes allegations of federal and state RICO violations and the Tennessee action does not.[16]

The Fourth Circuit has been reluctant to find actions parallel where there is any substantive difference between the actions. In McLaughlin, the Fourth Circuit noted the absence of any breach of contract claim in the state actions and explained, "[w]hile we agree that the federal and state actions have similar claims and draw on common events, they are not totally duplicative." McLaughlin, 955 F.2d at 935-36. *See also* New Beckley Mining, 948 F.2d at 1074 (actions not parallel because remedies sought and issues raised were not the same); Gannett, 286 F.3d at 742-43

---

[15] Although Blackburn and Benedict are not parties to the Tennessee action, they join in Appco's request for abstention.

[16] Although the Tennessee and North Carolina state law claims could be deemed "substantially similar," the similarities between the state law claims are not determinative.

(federal breach of contract action not parallel to state lien enforcement action arising out of the alleged breach of contract given the different issues and burdens of proof);[17] Al-Abood, 217 F.3d at 232-34 (legal issues not substantially the same despite common facts and arguments).

In an effort to address the inclusion of RICO claims in the federal action, Defendants attempt to equate RJR's civil conspiracy counterclaim in the Tennessee action with its RICO conspiracy claims before this Court. According to Appco, the state law civil conspiracy claim rests upon the same alleged facts, requires similar proof elements, and has similar burdens of proof. (Defs.' Reply Br., at 6.) Even if the Court were to accept the Appco Defendants' comparison, the fact remains that RJR asserts multiple substantive federal and state law RICO claims - not simply a RICO conspiracy. Many of RJR's substantive RICO claims require proof of precise, esoteric elements defined by statute (i.e., "pattern of racketeering activity"; "enterprise") not found in a state law civil conspiracy action. Appco further argues that the state law civil conspiracy claim distinguishes the facts here from those in the Merrill Lynch opinion, which RJR relies upon in its opposition brief. See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young, 1994 WL 88129 (S.D.N.Y. 1994)(federal case asserts a RICO cause of action which finds no counterpart in the state case). The Court rejects Defendants' argument given the substantive differences in the two actions. Al-Abood, 217 F.3d at 233.

---

[17] The Appco Defendants represent that Gannett does not support Plaintiff's claim that the claims at issue here are not substantially similar. (Presumably, because the appellate court deemed the state and federal contract actions parallel but declined to abstain after completing the "exceptional circumstances" analysis.) The undersigned disagrees. First, the litigants ultimately agreed in Gannett that the contract actions filed in different courts were, in fact, parallel. Gannett, 286 F.3d at 741. Secondly, with the exception of the *independently filed* State Lien Action, there was no question of additional claims or issues precluding such a finding.

The Appco Defendants also argue that if this Court abstains, RJR could amend its state court pleadings and that such amendment "could be easily accomplished."[18] (Defs.' Reply, at 7. Similarly, Defendants assert that if the RICO claims are dismissed for failure to state a claim pursuant to FED. R. CIV. P. 12(b)(6), the parties' respective actions will, in fact, be identical. The Court does not consider these contentions. In evaluating whether *Colorado River* Abstention is appropriate, the Court must examine the two actions based upon their current posture. Gannett, 286 F.3d at 745 n.6.

Further, RJR seeks injunctive relief in this case but only seeks monetary damages in its Tennessee state law counterclaims. Both actions seek compensatory relief and both will be tried before a jury. Defendants do not dispute that any difference in remedy sought is an appropriate factor for consideration. Instead, Defendants contend that, under these facts, Plaintiff's failure to seek injunctive relief in the Tennessee action "should not weigh heavily." (Defs.' Reply Br., at 7.) Certainly, this factor is not entitled to any more weight than any other factor.

In conclusion, the Court is not persuaded that the Tennessee action will serve as an adequate vehicle for the complete and prompt resolution of *all* of the issues between RJR and the Appco Defendants. Moses H. Cone Mem.'l Hosp., 460 U.S. at 28. Because the actions are not "parallel" for purposes of *Colorado River*, "exceptional circumstances" abstention analysis is not necessary. Al-Abood, 217 F.3d at 233.

---

[18] Earlier, Defendants contended that the existing RICO claims were compulsory counterclaims that should have been brought in the Tennessee action.

## IV. Order

**IT IS HEREBY ORDERED** that Defendants' Motion To Abstain is **DENIED**.

Signed: August 7, 2006

Richard L. Voorhees
United States District Judge