| | |
|---|---|
| **R.J. Reynolds Tobacco Company,** ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Memorandum and Order** |
| ) | |
| **Market Basket Food Stores, Inc.,** ) | |
| **et al.,** ) | |
| **Defendants.** ) | |
| ) | |

**THIS MATTER** is before the Court on Plaintiff R.J. Reynolds Tobacco Company's

Verified Complaint, Motion For Preliminary Injunction, and Memorandum In Support. (Documents

#1- #3)  Plaintiff R. J. Reynolds (or "RJR") only seeks injunctive relief against certain core members

of the alleged conspiracy or "Core Defendants."[1]

On November 16, 2005, the undersigned presided over an evidentiary hearing.  All of the

Core Defendants were present and represented by counsel.  With the exception of Defendants DWI,

LLC[2] and Hobart Anderson, who moved for dismissal based upon lack of personal jurisdiction, all

of the Core Defendants participated in the hearing.  All parties had an opportunity to present

evidence and speak on the merits of Plaintiff's motion.  At the conclusion of the hearing, the Court

---

[1] Plaintiff identifies the Core Defendants as follows:  "Previously Contracted Retailers" - Market
Basket, Steve Hunt, APPCO, Jeffrey Benedict, Daniel Blackburn; and "4th Tier Wholesalers"  -  RJ
Marketing, Jason Carpenter, J & L Distributors, Foster Qualls, Dave's Distributing, Dave Ritchie, DWI
Wholesale and Hobie Anderson.

[2] Defendant DWI explains in its Motion To Dismiss that Plaintiff has not identified the corporate
entity correctly and that "DWI Wholesale, LLC" is actually "DWI, LLC."

issued an oral order denying one aspect of Plaintiff's motion for injunctive relief, namely, Plaintiff's request that the Court freeze assets of the Previously Contracted Retailer Core Defendants.[3] The Court also denied a motion for expedited discovery sought by Plaintiff. This Memorandum and Order focuses solely on the question of injunctive relief with respect to the buying and selling of bought-down RJR cigarettes and does not in any way alter the Court's previous oral rulings.

## I. Nature Of Case

On September 23, 2005, Plaintiff filed its Verified Complaint alleging twenty-one (21) different causes of action against twenty (20) individual and corporate Defendants.[4] Plaintiff's Verified Complaint alleges multiple violations of the federal and North Carolina racketeering statutes as well as state law claims including unfair and deceptive trade practices, fraud, breach of contract, tortious interference with contractual relations, and civil conspiracy.[5]

---

[3] Plaintiff requested that the Court enjoin the Previously Contracted Retailer Defendants from selling, transferring, assigning, distributing, liquidating, encumbering, or in any way disposing of or reducing the value of any assets, including property, cash, accounts receivable, equipment, vehicles, tangible or intangible personal property, goodwill, or any other tangible or intangible assets, without consent of the Court, except for payment of ordinary monthly living and business expenses as the Court deemed reasonable. (RJR's Mem. In Supp., at 49-51.) Plaintiff also sought an equitable accounting of Defendants' profits, disgorgement of Defendants' ill-gotten proceeds, and the imposition of a constructive trust on all funds or property that can be demonstrated to be proceeds or profits made via the alleged scheme. (Id.)

[4] There are only 16 Defendants in the case now because Plaintiff voluntarily dismissed its claims against Defendants James Crump and BCW Properties, Inc., d/b/a Holiday Foods, on December 12, 2005. (Document #155) More recently, the claims against Defendants Appco and James Benedict were dismissed with prejudice. (Document #195)

[5] In Counts 1 - 9, Plaintiff alleges civil violations of RICO pursuant to 18 U.S.C. §1962(c) / Pattern Of Racketeering Activity. Count 10 alleges violations of 18 U.S.C. §1962(a) / Receipt Of Income From Racketeering Activity. Count 11 alleges Defendants conspired to violate the federal RICO laws, 18 U.S.C. §1962(d). Counts 12 - 16 allege violations of North Carolina's RICO statute, N.C. Gen. Stat. §§75D-4(a)(1) - (3) / Participation In Pattern Of Racketeering Activity Through Enterprise, Engaging In Racketeering Activity Or Acquiring Interest In Proceeds From Racketeering Activity, and RICO Conspiracy. Count 17 alleges unfair and deceptive trade practices pursuant to N.C. Gen. Stat. §75-1.1.

Plaintiff seeks a preliminary injunction enjoining certain wholesalers from purchasing and / or selling RJR bought-down cigarettes from / to anyone, including but not limited to any wholesaler or retailer. With respect to its previously contracted retailers, Plaintiff seeks a preliminary injunction enjoining the retailers from purchasing and / or selling RJR bought-down cigarettes from anyone, including but not limited to any wholesaler or retailer. In addition, Plaintiff asks that individual defendants be enjoined from engaging in the same conduct through any other business entities.

Plaintiff's federal and state RICO claims were immediately attacked by the defense and subjected to multiple Rule 12(b)(6) motions. (Documents #110, #116, #125, #134, #151, #191 and #192) These motions have since been resolved in favor of RJR. Given the complexity of the case, and the relationship between Defendants' Rule 12(b)(6) motions and Plaintiff's request for injunctive relief, there has been significant delay in addressing the instant motion.[6]

On October 31, 2006, RJR represented to the Court that it has reached "settlements in principle" with Defendants Jason Carpenter, RJ Marketing, DWI Wholesale and Hobie Anderson. Although the claims against these Defendants have not been voluntarily dismissed to date, the injunctive relief provided for by the instant Memorandum & Order will not apply to these parties. In the event settlement is not consummated, the Court will address application of this ruling to those parties in a separate order.

---

Count 18 alleges common law fraud. Count 19 alleges breach of contract. Count 20 alleges tortious interference with contractual relations. Count 21 alleges a civil conspiracy.

[6] As explained herein, given the uncertainties with respect to the availability of injunctive relief for a private civil litigant under RICO, the undersigned declines to consider or rely on Plaintiff's RICO claims to support this extraordinary remedy.

## II. Findings Of Fact

R.J. Reynolds is the second largest manufacturer of cigarettes in the United States. RJR competes with other cigarette manufacturers including Philip Morris, Lorillard, and "Fourth-Tier" manufacturers. RJR's market share is approximately 30% of the U.S. market.[7]

The cigarette industry is unique in that advertising is heavily regulated. For example, the only channels for consumer advertising are print media, direct mail, and retailer or point-of-purchase advertising. The consumer market for cigarettes is shrinking, reportedly decreasing by between 2% and 4 % annually. Given these characteristics, the cigarette industry is highly competitive.

Retailer marketing is RJR's most effective means of communicating with consumers. Absent some agreement with the retailer providing for point-of-purchase advertising, RJR's ability to market its product is limited.

RJR has two major trade marketing programs - the Wholesale Partners Program and the Retail Partners Program. RJR enters into marketing relationships with certain wholesalers and retailers in an effort to compete against other tobacco manufacturers in the marketplace. These marketing relationships are governed by a series of marketing contracts. (RJR's Exhs. 19, 20)

RJR distributes its cigarettes exclusively to wholesalers that participate in its Wholesaler Partners Program. RJR pays participating wholesalers ("Contracted Wholesalers") cash incentives for the volume of cigarettes sold and offers discounts for early payment in addition to other benefits. In exchange, the Contracted Wholesalers are required to provide information about purchases, sales,

---

[7] The market shares breakdown as follows: Philip Morris 50% (Marlboro); RJ Reynolds 30% (Camel, Kool); Lorillard 10% (Newport); and Fourth-Tier Manufacturers - the remaining 10%. (Tr. at 14-15.)

and returns of RJR cigarettes to a third-party data collection service. This data is referred to as "AIM" data and is analyzed by Management Science Associates, Inc. ("MSA"). The AIM data, and MSA statistical analyses, is the foundation for RJR's marketing strategies. RJR relies on MSA's s analyses to analyze the market, help determine the effectiveness of its marketing programs, to make decisions regarding implementation of its marketing programs, and to verify its contracts are being honored.

RJR's Retail Partners Program likewise provides financial incentives to participating retailers ("Contracted Retailers"). RJR's "Buy-Down" Program is the primary financial incentive.[8] RJR's "Buy-Down" Program is a marketing initiative that rewards Contracted Retailers with per-carton dollar discounts (or rebates), ranging from approximately $5.50 to $8.00 per carton, on promoted cigarette brands. The buy-down program typically operates as follows: retailers are required to purchase RJR product from wholesalers at full price and then request the appropriate discount or "buy-down" payment directly from RJR. Prior to the Fall of 2003, however, the Buy-Down Program operated slightly differently. Defendants Appco and Market Basket initially participated as "Third-Line Contracted Retailers."[9] This means that Appco and Market Basket purchased RJR product at the bought-down price from the wholesaler and the wholesaler was the entity reimbursed by RJR in the amount of the applicable discount.[10]

---

[8] Other cigarette manufacturers utilize similar discounting or buy down programs.

[9] The parties refer to the earlier form of the buy-down program in their filings as "Third-Line Discounting."

[10] According to RJR, whether paid directly to the retailer or indirectly via a third-line discount, RJR's buy-down payments have always been contingent on the participating retailer's satisfaction of all of its contractual obligations.

In exchange for the "buy-down" discount, the Contracted Retailer must comply with RJR's requests for in-store promotion and advertising of its product as well as provide RJR with input on pricing. One of the objectives of RJR's buy-down program is to ensure the prominent placement of RJR's advertising and promotional displays (i.e., point-of-purchase displays, other signage) - known in the industry as "presence." RJR's "presence" in the retail stores allows it the opportunity to support current marketing campaigns and / or promote the future development of certain products.

Compliance with RJR's admittedly sophisticated marketing program is cumbersome. In addition to complying with RJR's detailed retail advertising specifications, there are restrictions placed on Contracted Retailers. Under the terms of RJR's typical retail contract, 1) the retailer must purchase RJR product from a Contracted Wholesaler that provides AIM data to RJR; 2) the retailer can only buy, sell or trade RJR's promoted or discounted product[11] to adult consumers as opposed to other retailers or wholesalers; and 3) 100% of the buy-down discount must be passed along to the consumer. (RJR's Exhs. 20, 33) Contracted Retailers' sales are also subject to a 5-carton per customer limit - another check on the contractual requirement that Contracted Retailers not sell promoted product to other wholesalers or retailers. RJR may audit its Contracted Retailers pursuant to the terms of the contract. RJR also has the ability to cancel the contract under certain conditions and recoup buy-down monies paid to a retailer in error.

Retailers who choose not to participate in RJR's Buy-Down Program are not entitled to purchase bought-down RJR cigarettes and are expected to pay full-price (standard wholesale price).

---

[11] RJR's "promoted or discounted product" refers to cigarettes *promoted and discounted* via the Buy-Down Program. While the level of support for each brand may vary, RJR applies buy-down dollars against the following brands of cigarettes: Camel, Kool, Winston, Salem, Doral and Pall Mall. (Tr. at 76.)

As noted, RJR's Marketing Contracts expressly prohibit selling bought-down cigarettes to other retailers or wholesalers. Thus, the purported advantage of the Buy-Down Program to Contracted Retailers is the ability to offer discounted RJR product to its customers which, in turn, allows the retailer to compete more effectively with other retail convenience stores and, presumably, increase its overall sales.

Notwithstanding the year or Contracted Retailer, the terms of RJR's retail contracts remain fundamentally the same. (Tr. at 25, 36; RJR's Exhs. 16, 20, 33) The terms of RJR's Retail Partners Marketing Contracts, including restrictions on the purchase and sale of bought-down cigarettes, are generally known in the marketplace. (Tr. at 128; Duncan Aff., ¶5; Hall Aff., ¶8; Workman Aff., ¶5)

RJR created a Retail Review Group in 1998 to combat what it termed "buy-down fraud." RJR defines "buy-down fraud" as "the inappropriate buying or selling of [RJR's] discounted product between wholesalers and retailers." (Tr. at 112.) The alleged buy-down fraud at the heart of the instant dispute was detected when RJR noticed certain retailers were experiencing unexplained spikes in the volume of cigarette sales and engaging in non-taxable transactions. Through its audits, RJR discovered that "special orders" were being placed with Contracted Wholesaler H.T. Hackney by Contracted Retailers Appco and Market Basket. The "special orders" were distinguishable from other typical or regular orders in several ways, including the absence of any customer order number and a truck number greater than five.[12] ( Tr., at 118, 120-22; RJR's Exh. 32; Duncan Aff., ¶¶21-25) In addition, these special orders consisted primarily, if not entirely, of bought-down RJR cigarettes, as opposed to orders for other grocery or convenience products.

---

[12] The truck number for cigarette orders filled by H.T.Hackney coincided with the day of the work week the product was delivered. For example, a Monday delivery would have a truck number of "1" while a Friday delivery would have a truck number of "5."

The purchases of RJR cigarettes documented in the special orders were not accurately reported to RJR or MSA. For instance, the cigarettes Appco ordered for J & L were reflected as having been delivered to Appco stores, resulting in actual Appco sales. (RJR's Exh. 5, 6; Blackburn Dep. at 196-205.) Similarly, the RJR cigarettes ordered by Appco, Market Basket, and Workman Oil for resale to R. J. Marketing, were reflected as having been delivered to the Contracted Retailer placing the special order, and resulting in actual consumer sales by the respective retailer. (RJR's Exh. 21) The same false reporting occurred with respect to purchases by Holiday Foods on behalf of Market Basket. (Crump Aff., ¶8)

Several entities have now admitted to participating in the buy-down fraud alleged within RJR's Verified Complaint.[13] (Tr. at 113-114.) After a thorough review of the voluminous exhibits submitted by the parties, the Court makes the following specific factual findings.

### a. Daniel Blackburn

Appco operates a chain of convenience stores in Northeast Tennessee, Southwest Virginia, and Eastern Kentucky. Daniel Blackburn ("Blackburn"), Appco's former President of Convenience Store Operations, remains a Defendant in this action.[14]

RJR and Appco conducted business pursuant to Retail Partners Marketing Contracts ("Marketing Contracts") from January 1999 through June 11, 2004. (RJR's Exh. 33) Accordingly, Appco was required to follow RJR's guidelines with respect to point-of-sale marketing of RJR

---

[13] Hileman Tobacco admitted selling to Wholesale House Tobacco Outlet ("WHTO"). (Tr. at 113.) Holiday Foods admitted selling to Dave's Distributing. (RJR's Exh. 17) Friendly Center Grocery admitted selling to and purchasing from Dave's Distributing. (RJR's Exh. 67) Workman Oil admitted selling and purchasing bought-down RJR cigarettes as well. (RJR's Exhs. 2-4)

[14] Since the filing of the Verified Complaint, chambers staff has been advised that Blackburn is no longer employed by Appco.

brands and received bought-down RJR product. While on contract with RJR, Appco, like most of the other Defendants, purchased its RJR product from Contracted Wholesaler H.T. Hackney Company ("Hackney").[15]

In May 2005, Defendant Blackburn was deposed in connection with related state court proceedings.[16] Blackburn testified that Jason Carpenter ("Carpenter"), a former RJR employee who was working with J & L Distributors ("J & L") at the time, approached him about the possibility of Appco selling bought-down RJR product. (Blackburn Dep. at 146.) Blackburn admits approving the practice on behalf of Appco. (Id.) Around 2002, Blackburn first began to place "special orders" with H.T. Hackney on behalf of J & L. (Id. at 149.) Carpenter was responsible for picking up the RJR product from individual Appco stores. (Id. at 146-48; RJR's Exh. 34) Special orders were split and allocated for invoicing and delivery amongst multiple individual Appco stores. (Id. at 149-152.) According to Blackburn, Ross Tutterow at H.T. Hackney made this adjustment but Blackburn was less than forthcoming to Plaintiff about the reason for splitting the orders this way. (Id.) Blackburn admitted adding between .50 cents and $1.00 profit margin per carton to the bought-down cigarettes sold by Appco. (Id. at 231.)

When Carpenter moved to R.J. Marketing, Appco stopped selling bought-down cigarettes to J & L and began selling bought-down cigarettes to R.J. Marketing. (Blackburn Dep. at 228.) According to Carpenter, R. J. Marketing did not begin buying or purchasing RJR cigarettes until

---

[15] Hackney, the distributor for most of the RJR bought-down product at issue, is not named as a Defendant in this action.

[16] The related action was commenced in the Circuit Court for Sullivan County, Tennessee. *See Appalachian Oil Co., Inc. v. RJ Reynolds Tobacco Co and Kerry Sizemore, Civil Action No.: C3146.* This Court declined to abstain in favor of the Tennessee litigation. (Doc. #183) The current status of the Tennessee case has not been made known to this Court.

July of 2003. (Carpenter Aff., ¶9) In his dealings with R.J. Marketing, Blackburn continued the practice of placing special orders with the wholesaler. (Blackburn Dep. at 163.) The invoicing and delivery was also handled in a similar manner although at some point, Carpenter began to pick up the R.J. Marketing orders directly from Hackney.

During 2003, RJR became suspicious that Appco was selling bought-down RJR cigarettes to non-participating retailers or wholesalers and pocketing a portion of the buy-down discount. In March 2004, after noticing spikes in the volume of Appco's sales, RJR initiated an audit of Appco. RJR terminated its contract with Appco on June 11, 2004.

Once Appco could not purchase discounted RJR cigarettes as a Contracted Retailer pursuant to a Marketing Contract, Appco became an off-contract purchaser of bought-down RJR cigarettes. (Blackburn Dep. at 187-88, 232-33.) This arrangement began when Blackburn introduced Stephen Hunt, co-owner of Market Basket, to Jason Carpenter. (Id. at 187-88; Hunt Decl., ¶8) Following this introduction, it appears that, contrary to the terms of its Marketing Contract with RJR, Market Basket began to supply R. J. Marketing with bought-down RJR cigarettes, who in turn supplied Appco.[17] (See "II, b") According to Blackburn, R.J. Marketing was Appco's sole source for bought-down RJR cigarettes. (Id. at 234.)

### b. Market Basket and Stephen Hunt

Market Basket Food Stores ("Market Basket") consists of two mid-sized grocery stores as well as fifteen convenience stores in the western part of North Carolina. (Hunt Decl., ¶3) Stephen Hunt ("Hunt") is a Co-Owner and Operational Manager of Market Basket. (Hunt Decl., ¶2)

---

[17] Plaintiff obtained a copy of an invoice reflecting a sale of bought-down RJR cigarettes by R.J. Marketing from Fourth-Tier Wholesaler DWI with shipment to Appco. (RJR's Exh. 12)

Market Basket had a retail contract with RJR through October 2003. (Hunt Decl., ¶6; RJR's Exh. 20) Market Basket was first recruited by Contracted Wholesaler H.T. Hackney, with the assistance of Defendant Blackburn. In September or October 2002, Hunt was approached by Ross Tutterow ("Tutterow") at a Hackney function and asked whether Market Basket would be interested in selling "more cigarettes." (Hunt Decl., ¶7) According to Hunt, he qualified his affirmative response by adding "if it [is] legal." (Id.) Hunt explains his interest was due to the fact that Market Basket's revenue for cigarette sales was determined primarily by the volume of cigarettes sold. (Id.) In November 2002, another Hackney employee introduced Hunt to Blackburn. (Id., ¶8) Blackburn provided Hunt with a brief overview of the proposed cigarette sales to internet customers and later explained in detail how the internet sales arrangement worked, how cigarette orders were placed, and how cigarettes were picked up. (Id.) Blackburn indicated that Jason Carpenter would be in contact.

Market Basket received its first order for cigarettes for R.J. Marketing in mid-November 2002. (Hunt Decl., ¶10) Hunt states that he received the order from Blackburn and that Blackburn explained that Carpenter was a "broker rather than a retailer or wholesaler." Id. Since November 2002, Market Basket has purchased RJR cigarettes for resale to R. J. Marketing from H.T. Hackney in Newton, North Carolina; Holiday Foods in Lenoir, North Carolina; Workman Oil in Forest, Virginia; Dave's Distributing in Troutman, North Carolina; and Raceway in Hickory, North Carolina. (Hunt Decl., ¶31) Hunt admits that Workman Oil's[18] purchases of RJR cigarettes from H.T. Hackney and subsequent sales to Market Basket were intended for resale to R.J. Marketing. (Hunt Decl., ¶23)

---

[18] Workman Oil is a Non-Core Defendant that has since been voluntarily dismissed from this action. Hunt played a part in recruiting Workman Oil.

Market Basket drew the attention of RJR's sales staff in early 2003, at which time the Retail Review Group began to monitor Market Basket's sales. (Tr. at 137.) Between March and June of 2003, Market Basket experienced a 54% increase in sales that could not be explained by market conditions. In October 2003, RJR initiated an audit of Market Basket's stores. RJR discovered "special orders" of RJR bought-down cigarettes as well as a significant number of tax-free sales. (Tr. at 138.) The tax-free sales indicated that the cigarettes were not being sold to consumers but instead to other retailers. (Id.) Hunt continued to deny any wrongdoing by Market Basket. (RJR's Exh. 30) RJR began to withhold buy-down payments for Market Basket's sales as well as other financial incentives provided for in the Marketing Contract.[19] Before the audit concluded, Hunt terminated Market Basket's contract with RJR. (Id., ¶25; RJR's Exh. 27)

After canceling its Marketing Contract, Market Basket continued to sell RJR cigarettes to R.J. Marketing through approximately September 15, 2005. (Hunt Decl., ¶25) Market Basket also purchased cigarettes from Wholesalers H.T. Hackney and DD, as well as other retailers. (Id., ¶¶25, 26) According to Hunt, since mid-September 2005, Market Basket has been purchasing cigarettes exclusively from DD and only selling cigarettes to the customers of its own retail stores. (Id.)

### c. Dave's Distributing and David Ritchie

Dave's Distributing is a Fourth-Tier Wholesaler with its business operations located in Troutman, North Carolina. Dave's Distributing ("DD") has never entered into any contract with RJR. David Ritchie ("Ritchie") is the owner of DD.

---

[19] Market Basket asserts that since October 2003, RJR has improperly withheld payment in excess of $190,000.00 for buy-down payments, volume rebates, and coupon reimbursements due Market Basket. (Hunt Decl., ¶29)

RJR presents evidence documenting DD's purchases of bought-down RJR cigarettes from Contracted Retailers via repeated five-carton purchases. Dave's Distributing purchased bought-down RJR cigarettes from Friendly Center Grocery and Holiday Foods. (Splitt Aff., ¶¶6-9, 11; Crump Aff., ¶¶12-14) Alex Splitt, owner of Friendly Center Grocery, avers that Dave Ritchie and DD only purchased RJR product from his store and always paid in cash. (Splitt Aff., ¶¶8, 11) Friendly Center Grocery and DD continued this arrangement from early 2003 to March 2004. (Splitt Aff., ¶¶6,12) According to James Crump, co-owner of Holiday Foods, DD purchased bought-down cigarettes from Holiday Foods for a relatively short period of time but also later *supplied* Holiday Foods with bought-down RJR cigarettes once Holiday Foods was audited and was no longer on contract with RJR. (Crump Aff., ¶¶13-14, 16; RJR's Exh. 64) Dave's Distributing also supplied Market Basket with RJR product. (Hunt Decl., ¶25)

Prior to confirming its suspicions about DD, on September 2002, RJR wrote Dave Ritchie and DD and expressly advised that RJR's merchandising contracts require that bought-down cigarettes be sold by Contracted Retailers only to adult smokers. (RJR's Exh. 48)

Dave's Distributing, acting through its agents, continued this practice as late as January 2005. In fact, during the hearing, Plaintiff produced credit card receipts dated January 20, 2005, documenting ten (10) different 5-carton purchases from Contracted Retailer WilcoHess, LLC ("Wilco"),[20] via a credit card in the name of "DD Ritchie." (RJR's Exh. 52)

---

[20] Wilco is not a party to this action.

#### d. J & L Distributors and Foster Qualls

J & L Distributors, also a Fourth-Tier Wholesaler, is located in Weber City, Virginia. Foster Qualls is the alleged Owner and Manager of J & L. Jason Carpenter also worked for J & L during a portion of the relevant time period.

It is not clear from the existing record exactly when J & L Distributors became involved in the alleged buy-down scheme.[21] According to Blackburn, J & L began selling fourth-tier cigarettes to Appco in or around April or May of 2002. (Blackburn Dep. at 118.) Carpenter was employed with J & L during these dealings. (Id. at 123.) Jason Carpenter admits engaging in buy-down transactions while he was employed by J & L, but also asserts that J & L was already engaged in the purchasing and selling of bought-down RJR product before his employment with J & L. (Carpenter Aff., ¶8) Between 2002 and 2003, Carpenter left J & L to operate R.J. Marketing. (Tr. at 215.)

## III. Legal Standard For Imposing Injunctive Relief

"[A] preliminary injunction is an extraordinary remedy, to be granted only if the moving party clearly establishes entitlement to the relief sought." Manning v. Hunt, 119 F.3d 254, 263 (4th Cir.1997)(quoting Hughes Network Sys., Inc. v. Interdigital Commc'ns Corp., 17 F. 3d 691, 693 (4th Cir.1994)). In order to obtain injunctive relief, the Plaintiff must show that without such relief, it will suffer irreparable injury and also that it is likely to prevail on the merits. Doran v. Salem Inn, Inc., 422 U.S. 922, 931 (1975). According to the Fourth Circuit Court of Appeals, in considering whether to grant a motion for a preliminary injunction, the following factors are relevant:

---

[21] As described above in more detail, Plaintiff offers the deposition testimony of Defendant Blackburn in support of RJR's claims against J & L as well as copies of invoices documenting certain of these alleged fraudulent sales. (RJR's Exhs. 1, 5, 9, 43)

> 1) the likelihood of irreparable harm to the plaintiff if the relief is denied;
> 2) the likelihood of harm to the defendant if the requested relief is granted;
> 3) the likelihood that the plaintiff will succeed on the merits; and
> 4) the public interest.

Direx Israel, Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 812 (4th Cir. 1991) (*quoting* Rum

Creek Coal Sales, Inc. v. Caperton, 926 F.2d 353, 359 (4th Cir. 1991)); see also Blackwelder

Furniture Co. v. Seilig Mfg. Co., Inc., 550 F.2d 189, 193 (4th Cir. 1977). The Plaintiff bears the

burden of establishing that these factors favor granting the injunction. Manning, 119 F. 3d at 263.

In considering these factors, the Court first must determine what irreparable harm will be

suffered by the Plaintiff if the relief is denied. The irreparable harm must be "neither remote nor

speculative, but actual and imminent." Direx Israel, 952 F.2d at 812. If the plaintiff makes a showing

of irreparable harm, the next step is to balance that harm against the harm to the defendant if the

relief is granted. Id. After balancing these two factors, the Court should grant the relief requested

if the balance "tips decidedly" in favor of the Plaintiff and if the dispute raises questions "so serious,

substantial, difficult and doubtful, as to make them fair ground for litigation. . ." Blackwelder, 550

F.2d at 195. However, if the balance tips in favor of the defendant, a stronger showing of likely

success on the merits is required. Rum Creek, 926 F.2d at 359.

## III. Availability of Injunctive Relief By A Private Litigant Under Civil RICO

Section 1964(c) does not expressly provide for equitable remedies for private litigants.

Section 1964, entitled "Civil remedies," provides the following:

> (a) The district courts of the United States shall have jurisdiction to prevent **and restrain** violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, **prohibiting any**

**person from engaging in the same type of endeavor as the enterprise engaged in,** the activities of which affect interstate or foreign commerce; or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons.

(b) The **Attorney General** may institute proceedings under this section. Pending final determination thereof, the court may at any time enter such restraining orders or prohibitions, or take such other actions, including the acceptance of satisfactory performance bonds, as it shall deem proper.

(c) **Any person** injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . .

18 U.S.C. §1964 (*emphasis added*). Equitable relief appears to be available generally under subsection (a), which does not distinguish between the different types of civil actions under the statute.[22] However, a comparison of subsections (b) and (c) reveals that Congress expressly provided for equitable relief in civil RICO actions where the Government commences the action but did not with respect to civil RICO actions initiated by private citizens.[23]

The Supreme Court has never been required to address the issue. <u>Scheidler v. Nat'l Org. For Women, Inc.</u>, 537 U.S. 393, 410 (2003)("We therefore need not address . . . whether a private plaintiff in a civil RICO action is entitled to injunctive relief under 18 U.S.C. §1964).

Fourth Circuit precedent indicates that this circuit court questions - if not frowns upon - the applicability of equitable remedies in the context of a civil RICO action brought by a private

---

[22] There is some authority, however, to the effect that Section 1962(a) does not apply in civil cases. <u>Central Bank of Denver</u>, 511 U.S. 164, 181-82 (1994); <u>Rolo v. City Investing Co. Liquidating Trust</u>, 155 F.3d 644, 657 (3rd Cir.1998).

[23] As a result, most secondary legal authorities conclude that only the federal government, not private litigants, may obtain equitable relief under the federal statute. *See* Hon. Jed. S. Rakoff, Howard W. Goldstein, and Eric H. Queen, *RICO: Civil and Criminal Law* §1.08 (2005); Joel Androphy, 2 *White Collar Crime* §13:4 (2d ed. 2005).

litigant.[24]   In <u>Dan River v. Icahn</u>, the Fourth Circuit considered the trial court's imposition of injunctive relief sought by Dan River pursuant to federal securities laws and RICO.  <u>Dan River, Inc. v. Icahn</u>, 701 F.2d 278, 290 (4th Cir. 1983).  In discussing the availability of injunctive relief to a private civil litigant under RICO, the Fourth Circuit stated in dicta:

> There is *substantial doubt* whether RICO grants private parties . . . a cause of action for equitable relief. Section 1964(c) grants private parties a right of action for treble damages against the RICO offender, but the section has nothing to say about injunctive relief.  Subsection (b) of section 1964 permits the attorney general to bring proceedings under the Act, and that provision – in sharp contradistinction to §1964(c) – allows for equitable relief.

<u>Dan River,</u> 701 F.2d at 290 (*emphasis added*).  The Fourth Circuit explained that in order to sustain the district court's injunction on RICO grounds, the plaintiff was required to establish that actions for equitable relief were implied in the statute.  <u>Id.</u>  Without deciding the issue, the Fourth Circuit noted that "the very existence of the uncertainty" weakened plaintiff's claim regarding probability of success.  <u>Id.</u>  The appellate court found that, in any event, plaintiff's likelihood of success on the merits of its RICO claims was slight.  <u>Id.</u>  *(citing* <u>Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Assoc.</u>, 453 U.S. 1 (1981)).  More recently, the Fourth Circuit again questioned the legal authority for a permanent injunction imposed in a civil RICO action.  <u>Johnson v. Collins Entm't Co.</u>, 199 F.3d 710, 726 (4th Cir.1999)(district court's reliance on "inherent equitable power" for imposition of permanent injunction in civil RICO action, and absence of express authority in federal

---

[24]    The only circuit courts that have squarely addressed this issue reached different results. Rakoff, Goldstein & Queen, *supra*, §1.08; *Compare* <u>Religious Tech. Ctr. v. Wollersheim</u>, 796 F.2d 1076, 1084 (9th Cir.1986)(injunctive relief is not available to a private party in a civil RICO action); *with* <u>Nat'l Org. For Women, Inc. v. Scheidler,</u>267 F.3d 687, 695-700 (7th Cir.2001). The majority of the other appellate courts that have weighed in or commented on this question  (the 2nd, 4th, 5th, and 6th circuits) respond negatively while the 8th Circuit answered in the affirmative.  <u>Id.</u>

RICO statute, supports argument for abstention by federal court)(*citing* Agency Holding Corp. v. Malley-Duff & Assocs., Inc., 483 U.S. 143 (1987)(Congress failed to enact bill that would have permitted private actions for injunctive relief under RICO.)); Potomac Elec. Power Co. v. Elec. Motor and Supply, Inc., 262 F.3d 260, 266 (4th Cir.2001)(acknowledging question regarding availability of equitable remedies in a private civil RICO action but declining to reach the issue).

For the reasons described herein, the Court does <u>not</u> consider or rely upon Plaintiff's RICO claims in determining whether injunctive relief is warranted.

## IV. Legal Analysis

### A. Balance Of Harms

In its filings Plaintiff RJR asserts irreparable harm as 1) monetary damages that are incalculable and 2) loss of customer loyalty, market share, and good will.   Plaintiff shifted its focus during the hearing to the alleged inability to market its product effectively, resulting in diminished market share.  As a result, the Court's analysis likewise focuses on Plaintiff's alleged  loss of retailer or point-of- purchase brand advertising.

The harm alleged by Plaintiff is the type of harm recognized in the Middle District of North Carolina as constituting an irreparable harm.  *See*  R. J. Reynolds Tobacco Co. v. Philip Morris, Inc., 60 F.Supp.2d 502, 509 (1999)(considering injunctive relief under federal antitrust laws and state trade practices statute).   In the <u>Philip Morris</u> case, Chief Judge Bullock found the following:

> Plaintiffs have made a clear showing of irreparable injury in the absence of injunctive relief.  In particular . . . Plaintiffs have demonstrated that [Philip Morris's] control of display space and signage . . . will cause all Plaintiffs to suffer irreparable injury in the form of lost goodwill and lost advertising opportunities, and incalculable harm to their respective competitive positions, including threatened loss of market share and threatened loss of existing and potential customers.  These types of injury or threatened injury have all been held to satisfy the irreparable injury requirement.

R. J. Reynolds Tobacco Co. v. Philip Morris, Inc., 60 F.Supp.2d at 509 (*emphasis added*) (citing Philip Morris, Inc. v. Pittsburgh Penguins, Inc., 589 F.Supp. 912, 920 (W.D.Pa.1983); Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 22 F.3d 546, 552 (4th Cir.1994); Medtronic, Inc v. Catalyst Research Corp., 664 F.2d 660, 663 (8th Cir.1981)).  Chief Judge Bullock found that *threatened* harm to the cigarette producers' competitive positions amounted to irreparable harm.  Id.  The Court now considers whether Plaintiff met its burden of producing sufficient evidence to support its allegations that injunctive relief is warranted.

There is conflicting evidence about the degree of harm the alleged buy-down scheme caused RJR.  According to Craig Hill, Senior Director-Sales Finance for RJR,  research conducted by RJR and third-parties established that the buy-down fraud had resulted in an *average* loss of approximately one-third of RJR's buy-down investment.[25]  (Tr. at  149-150.)  Hill explained that, as a logical matter, once RJR product enters a secondary distribution system,  "[E]ach person that touches that product is making money or they wouldn't be doing it.  So as you accumulate these margins that the secondary distribution system is adding on to the price of the product, it's eating into the buy down, thus increasing the price to the end consumer. . . "  (Tr. at 113.)  Defendants Market Basket and Hunt, along with others, deny misappropriation of the buy-down discounts and insist that they would not have agreed to any transaction that would not have allowed 100% of the buy-down discount to be passed along to the consumer.[26]  (Carpenter Aff., ¶5, 15-21; Hunt Decl., ¶¶24, 28)   Notwithstanding their intentions, Defendants are unable to document that, once sold to

---

[25]  Hill testified about research studies conducted by both RJR and third parties.  However, none of these studies was submitted in support of RJR's motion for injunctive relief.

[26]  Blackburn testified that R. J. Marketing added approximately .75 cents per carton to the RJR product. (Blackburn Dep. at 238.)

another entity, the buy-down on RJR cigarettes was, in fact, preserved and passed along to the individual consumer.[27]   Indeed, the  profitability of the buy-down scheme is conceded by other Defendants.  (Hall Aff. ¶26; Blackburn Dep. at 238-57; RJR's Exh. 61)   Workman Oil profited by as much as $100,000.00 as a result of its sales of bought-down cigarettes to Market Basket.  (Hall Aff., ¶¶18, 26)  The voluntary termination of Marketing Contracts by certain retailers likewise lends support to Plaintiff's argument.

Plaintiff has had limited success exercising its remedies under the Marketing Contracts.  RJR has been able to recover  its monetary loss for improper buy-down payments from certain retailers.  However, RJR's termination of its retailer contracts has not deterred the Defendants from continuing the buy-down fraud.   (Tr. at 130, 135-136.)

Defendants question the overall impact, if any, on RJR as a result of the alleged buy-down fraud.   Defendant contend that other financial incentives available to Contracted Retailers such as "product availability" or "presence" incentives provide sufficient motivation for retailers to remain on contract with RJR.   As of the hearing date, RJR had *permanently* lost only two contracts with retailers  - Appco and Market Basket.[28]   (Tr., at 64, 67)

Defendants further question their ability to inflict substantial and irreparable financial harm on Plaintiff given its size and success.   Appco presented documentary evidence establishing that Plaintiff's market share had remained relatively consistent between 2001 and 2003.   (Appco Hr'g

---

[27]  It appears that at least one of Carpenter's internet sources, The Cigar Cartel, did not sell to consumers at all.  (RJR's Exhs. 47, 63)

[28]  There were other Contracted Retailers that went off contract temporarily, namely, Holiday Foods and Workman Oil.  Williamette Valley Distributors also lost its contract.  (RJR's Exh. 62)

Exhs. 1-3, 18, 19; Tr., at 77-79.) However, there is no way to determine or measure whether RJR's share of the market might have expanded absent Defendants' conduct.

In any event, RJR's monetary loss from misappropriated buy-down discounts is not the primary harm driving Plaintiff's motion for injunctive relief. In this case, the more significant harms are the lost marketing opportunities and RJR's inability to rely on the analyses it receives from MSA as a result of the buy-down fraud and skewed AIM data. Evidence presented by Plaintiff related to the success of its Retailer Partners Program generally supports RJR's request. RJR's Director of Sales Strategies and Project Development, John Boehm, testified that for the second and third quarters of 2005, RJR's market share for its Contracted Retailers (38%) was more than double its market share for retailers not under contract (15%). (Tr. at 30, 98) While these figures are no guarantee of the program's success, they demonstrate the importance of effective implementation of the program to RJR. As for the inaccurate AIM data, RJR's ability to determine the popularity of certain brands in different markets, as well as its ability to evaluate the effectiveness of its marketing initiatives, in which it invests heavily, is inhibited as a result of Defendants' conduct.

Notwithstanding, Defendants uniformly challenge Plaintiff's claim of irreparable harm based upon the length of time it took for RJR to seek injunctive relief. *See generally,* Quince Orchard Valley Citizens Ass'n v. Hodel, 872 F.2d 75 (4th Cir.1989). During the hearing, Plaintiff adequately explained why it never sought injunctive relief against Appco in the related Tennessee action and why it has taken so long to put the pieces of this puzzle together. According to Plaintiff, one reason for its delay is the difficulty it experienced obtaining accurate information about the alleged conspiracy and racketeering conduct. The video deposition of Defendant Blackburn and Defendants' admitted efforts to conceal the challenged conduct illuminate this point. RJR also points out its

obligation to plead its fraud claims with particularity. Fed. R. Civ. P. 9(b). The undersigned is not persuaded by Defendants' argument regarding delay given the complexities, both factually and legally, of the instant case.

If injunctive relief is granted, the harm to Defendants differs depending upon the relationship, if any, the given Defendant has with RJR. According to Plaintiff, the only potential harm to Defendants if injunctive relief is granted is the loss of illegal / illegitimate proceeds they are not entitled to receive in any event. Indeed, the Defendants that stand to lose the most if the relief sought is granted are those that are allegedly currently engaged in the sale and distribution of RJR bought-down cigarettes.[29] Absent a valid and enforceable contract with Plaintiff RJR, a wholesaler or retailer is not entitled to sell or purchase discounted or bought-down cigarettes. This does not mean that Non-Contracted Wholesalers and Retailers are unable to sell RJR product. Rather, Non-Contracted Wholesalers and Retailers must pay the standard wholesale price and, therefore, are "stuck" with a higher, less competitive price.[30] *See* Multi-Channel TV Cable Co., 22 F.3d at 552-53 (defendant not harmed because preliminary injunction allowed it to compete in the open market). Thus, RJR's harm easily outweighs the potential harm to Non-Contracted Retailers and Wholesalers.

---

[29] Market Basket concedes that because it voluntarily ceased the sale of bought-down cigarettes prior to the initiation of this lawsuit, the harm it will suffer may be "slightly less significant." (Opp. Brf., at 14; Hunt Decl., ¶26.)

[30] RJR explains in its filings that the discounts or buy-down amounts vary as well as the number of Contracted Retailers in different markets. According to RJR, in some markets, there are relatively few, if any, Contracted Retailers selling RJR cigarettes. Therefore, the competitiveness of any given retailers' prices are largely dependent upon the location or market.

**B. Plaintiff's Likelihood Of Success On The Merits**

Plaintiff asserts that it has demonstrated irreparable harm such that it need only raise serious questions going to the merits.  In other words, Plaintiff contends that the balance of harms test tips decidedly in its favor.   Plaintiff also claims it has demonstrated a likelihood of success on the merits. Without considering Plaintiff's RICO and fraud claims, the Court agrees that this factor weighs in favor of RJR under either test.[31]   In other words, RJR has either raised such serious questions regarding the validity of its claims, or established a likelihood of success on the merits on one or more of its causes of action against each of the remaining Defendants.   The Court now turns to a discussion of the merits of Plaintiff's claims against each Defendant or Defendant group.[32]

**1. Breach Of Contract**  (Count 19)

**a. Market Basket**

Market Basket entered into a Marketing Contract  with RJR, similar to the retail contracts described, *supra*.   (RJR's Exh. 20)  Market Basket was bound by the terms of its Marketing

---

[31] Regarding Plaintiff's request for injunctive relief based upon fraud-related claims, Defendants assert that a common law fraud claim cannot be sustained where an action lies primarily in contract. Spillman v. American Homes, 108 N.C. App. 63, 65, 422 S.E.2d 740 (1992); North Carolina States Ports Authority v. Lloyd A. Fry Roofing Co., 294 N.C. 73, 81, 240 S.E.2d 345, 350 (1978).   However, given the Court's findings  with respect to Plaintiff's likelihood of success on the merits regarding its breach of contract claims and tortious interference with contract claims, the Court need not rely on Plaintiff's fraud claims in imposing injunctive relief.

[32] Given the different relationships between Plaintiff and the various Defendants, this inquiry is fact-specific and will depend on the specific cause of action and Defendant or group of Defendants at issue.

Contracts through October 2003 when Market Basket terminated the contract. Market Basket does not question the validity or enforceability of the respective Marketing Contracts.[33]

RJR presents ample evidence indicating its likelihood of success on its breach of contract claim against Market Basket.[34] Stephen Hunt admits Market Basket sold Plaintiff's bought-down product to other retailers but denies engaging in any sales that resulted in any portion of the buy-down discount being absorbed by the wholesaler, Market Basket, the "broker," or other retailer. In support, Hunt insists that these retailers had no choice but to sell [the cigarettes] at prices comparable to the retail pricing of contracted retailers." (Hunt Dec., ¶30.) Despite argument to the contrary, Hunt's admissions, combined with the evidence provided by Workman Oil, are sufficient to support the Court's finding regarding likelihood of success on the merits on this claim.

Market Basket's arguments regarding likelihood of success on the merits are not persuasive. Market Basket first asserts that its actions were consistent with the terms of the contract. More specifically, Market Basket contends that as long as the buy-down was preserved for the consumer, there is no breach. The undersigned has already disposed of this argument. (*See* IV, A) No matter what prices Market Basket charged its own retail customers, Market Basket does not provide

---

[33] Hunt claims 1) that his signature on the 2003 Marketing Contract entered into by RJR and Market Basket was electronically affixed to the document from a single paged document he signed acknowledging the financial changes between the 2002 and 2003 contracts; 2) that he was not aware that RJR was modifying the contract to include 2 additional pages; and 3) that he was not provided a copy of the 2003 contract until October 2003. (Hunt Decl., ¶6) However, neither Hunt nor Market Basket argues that Market Basket's Marketing Contracts with RJR are invalid or unenforceable.

[34] The same evidence supports RJR's claim alleging tortious interference with contractual relations against Market Basket. RJR also proffers evidence from Workman Oil revealing Market Basket's efforts to recruit additional purchasers / suppliers of bought-down RJR product. (RJR's Exhs. 2-4)

evidence that the other retailers and wholesalers in the secondary distribution chain actually preserved the buy-down. (Hall Aff., ¶18; Workman Aff., ¶9)

Market Basket next argues that "qualified" cartons of RJR cigarettes - cartons that qualify for the buy-down discount - are defined in the contract as cartons sold to a consumer "from *a* retail outlet." In other words, Market Basket claims that its Marketing Contract with RJR did <u>not</u> restrict retail sales of RJR bought-down cigarettes to the Market Basket stores only. Market Basket suggests that any breach of contract on these facts is merely "technical." The Court disagrees. To accept Market Basket's argument regarding interpretation of the contract would be nonsensical given the purpose of the contract as a whole - to ensure RJR has "presence" in the retail stores selling its product at the most competitive prices. A more reasonable interpretation of this provision is that *Market Basket* was required to sell to the consumer "from a *Market Basket* retail outlet."[35] Even so, Market Basket breached its contract by purchasing RJR product from entities other than Contracted Wholesalers providing AIM data to RJR and MSA.

Market Basket finally contends that Plaintiff did not suffer any damages. According to Market Basket, Plaintiff's sales and goodwill have been "enhanced by wider distribution at lower prices." (Opp. Brf., at 23.) The fact that RJR allocated significant financial and personnel resources to support a new division tasked with combating buy-down fraud belies Defendants' claim. There is no evidence in the record to indicate that RJR *benefitted* from the buy-down fraud alleged. ( Tr. at 51.)

---

[35] Because the Contracted Retailers had multiple retail stores, the use of "a" preceding the words "retail outlet" instead of "the" is consistent with this interpretation.

## 2.  Tortious Interference With Contract  (Count 20)

RJR asserts tortious interference claims against those Defendants who were not signatories to any Marketing Contract with Plaintiff such as Defendants Blackburn and Hunt.  RJR advances similar actions against various Fourth-Tier Wholesalers who never entered into any contractual relationship with RJR - DD, J & L, and their respective principles, Defendants Ritchie and Qualls.

In order to establish tortious of an existing contract under North Carolina law, Plaintiff must prove: 1) that a valid contract existed between the Plaintiff and third person; 2) that Defendant had knowledge of the contract; 3) that Defendant intentionally induced the third person not to perform his contract with Plaintiff; 4) that Defendant did so without justification; and 5) that the breach resulted in actual damages to Plaintiff.  <u>Childress v. Abeles</u>, 240 N.C. 667, 674, 84 S.E.2d 176 (1954); <u>United Lab, Inc. v. Kuykendall</u>, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988).

A defendant does not maintain the requisite knowledge or intent to tortiously interfere with a contract unless the defendant "knows the facts which give rise to the plaintiff's contractual right against the third person" and "intentionally commit[s] a harmful act without legal justification." <u>Childress</u>, 240 N.C. at 674-75.

In this case, the relevant Defendants contend that the third and fourth criteria of a tortious interference claim are not satisfied such that RJR cannot show its likelihood of success on the merits. Defendants either feign ignorance of the Marketing Contract terms,  attempt to justify their actions by asserting that RJR was not harmed by the commercial transactions at issue, or both.  Defendants' claims lack merit.

### a. Evidence Against Daniel Blackburn

Blackburn does not pretend he was unaware of the provision within Appco's Retail Marketing Contracts with RJR that prohibited the sale of RJR bought-down cigarettes to other retailers or wholesalers. Nor does Blackburn appear to deny knowledge of Hackney's Wholesaler Marketing Contracts with RJR.

Blackburn's defense is essentially that advanced by Appco prior to its dismissal from the case. Appco alleged that as early as 2003, Blackburn had conversations with RJR Regional Representative, Kerry Sizemore ("Sizemore") and Sales Representative Matt Kukura ("Kukura"), disclosing the fact that another unidentified retailer was purchasing large quantities of cigarettes from a nearby Appco store. (Blackburn Dep. at 126, 131.) Blackburn claims that Sizemore acquiesced, telling Blackburn essentially, "I'm not going to tell you not to sell cigarettes" but if this practice continues, "I don't want to know about it." (Blackburn Dep. at 131, 134 -135.) Blackburn purportedly relied upon Sizemore's response and began (or continued) selling cigarettes to J & L and R.J. Marketing. (Blackburn Dep. at 141-145.) Blackburn's deposition testimony makes clear that Blackburn never *expressly* told Sizemore or Kukura about Appco's sales of bought-down RJR product to J&L or R.J. Marketing. (Blackburn Dep. at 126-127, 141-145.)

While Blackburn did not admit it, his deposition testimony regarding the rationale behind Hackney's allocation of Appco's "special orders" amongst various Appco stores is not credible. There is also evidence that Blackburn was instrumental in expanding the buy-down scheme by helping to recruit other Contracted Retailers (i.e., Market Basket).

At minimum, RJR has raised serious questions regarding the merits of its tortious interference claim against Defendant Blackburn.

### b. Evidence Against Stephen Hunt

Hunt operated Market Basket, executed Market Basket's Marketing Contracts[36] with RJR on behalf of Market Basket, and was fully aware of the contract terms. As noted herein, RJR presents ample evidence establishing that Market Basket, at Hunt's direction, engaged in buy-down fraud as defined by RJR. (*See* "IV, B, 1 a")

In addition, RJR presents evidence tending to show that Hunt personally recruited Workman Oil and Holiday Foods, both previously Contracted Retailers with RJR, for participation in the buy-down scheme. In February 2005, the officers and shareholders of Workman Oil disclosed their involvement with Market Basket and the buy-down scheme to RJR. (Duncan Aff., ¶45) Reportedly, Scott Shepherd ("Shepherd"), Workman Oil's Hackney contact, introduced Warner Hall ("Hall"), President and Co-Owner of Workman Oil, to Hunt in 2002. (Hall Aff., ¶¶10-12; Hunt Decl., ¶22) Hunt worked with Sheperd to recruit Workman Oil. Hunt reportedly advised Workman Oil Officers that he was selling the bought-down product to an internet distributor in California for resale to consumers.[37] (Duncan Aff., ¶9; Hunt Decl., ¶¶23, 27) <u>According to Hall</u>, Hunt openly acknowledged that this conduct was in violation of RJR's Retailer and Wholesaler Marketing Contracts. (Hall Aff., ¶15) James Crump, one-third owner of Holiday Foods, tells a similar story. (Crump Aff., ¶¶6-11)

---

[36] Hunt admits personally signing the 2002 Marketing Contract and apparently authorized the use of his electronic signature on the 2003 version.

[37] The Cigar Cartel, a Non-Contracted Wholesaler and internet distributor out of California mentioned in the Carpenter Affidavit, has apparently sold RJR cigarettes although it is not under contract with RJR. (Tr. at 144-45.) In addition, the entity's website expressly represents that it does not sell to the general public but instead only distributes to other wholesalers and retailers. (RJR's Exh. 47)

The only *potential* justification offered by Hunt is the fact that RJR's Contracted Wholesaler, H.T. Hackney, was involved in the scheme - a fact more probative of whether Market Basket intended to defraud RJR than whether there was intentional interference. RJR has established a likelihood of success on the merits with respect to the tortious interference claim against Hunt.[38]

### c.  Evidence Against Dave's Distributing and David Ritchie

Dave's Distributing and Ritchie claim that because DD never dealt directly with RJR, and never had a contractual relationship with RJR, that DD was not cognizant of the contract provisions at issue and could not knowingly or intentionally interfere.

RJR presents evidence that DD, through Ritchie, developed relationships with several of RJR's Contracted Retailer Defendants (i.e., Friendly Center Grocery, Holiday Foods). (RJR's Exh. 67, ¶¶6-11) Ritchie denies participation in any "black market" for RJR cigarettes. (Ritchie's Suppl. Aff., ¶8) Instead, Ritchie claims he relied entirely on the Contracted Retailers to abide by any limits of cartons per customer and that he did not "have any knowledge as to the reasons for any such limitations." (Ritchie's Suppl. Aff., ¶¶2, 3, 5, 6, 7) Ritchie also avers that when he purchases cigarettes, he has no way of knowing whether cigarettes are "bought-down" as there is no such designation on the packaging and there are other possible explanations for the lower prices. (Ritchie's Suppl., Aff., ¶¶4, 5) Even if this were factually correct, Ritchie's purchases were <u>not</u> from a Contracted Wholesaler, the exclusive distribution entities for RJR product. Given the other evidence in this case, it is disingenuous for DD and Ritchie to claim ignorance.

---

[38] The Court does not need to reach the question of likelihood of success on the merits regarding Defendant's tortious interference with entities participating in RJR's Coupon Redemption Program.

Plaintiff produces circumstantial evidence that Ritchie at least had constructive knowledge of the Retail Partners Contracts and the pertinent terms. Ritchie claims that J.R. Tobacco and Wilco recommended that DD enter into multiple 5-carton transactions in order to comply with the limitation. (Ritchie's Suppl. Aff., ¶6) While Ritchie apparently claims the actions of J.R. Tobacco and Wilco constitute legal justification, his concession implies Ritchie's constructive knowledge of the 5-carton per person limit. In addition, the fact that DD's purchases of bought-down cigarettes from Friendly Center Grocery were consistently paid in cash for the duration of their relationship, approximately a one-year period, reveals knowledge as well as a desire to conceal the transaction. At minimum, Ritchie became aware of the ramifications of his conduct following receipt of correspondence from RJR in September 2002. (RJR's Exh. 48) Despite RJR's letter, Ritchie and DD proceeded in the same manner. Ritchie's multiple, contemporaneous 5-carton purchases of bought down cigarettes from Contracted Retailers supports the third element - intentionally inducing the third party not to perform under the contract.

As for damages, Plaintiff alleges it sustained a minimum of actual monetary damages in the amount of $1,241,155.20 for buy-down payments that ultimately benefitted Non-Contracted Retailers or Fourth-Tier Wholesalers such as Dave's Distributing as opposed to adult consumers. (RJR's Compl., ¶159)

Plaintiff successfully demonstrates a likelihood of success on the merits against Dave's Distributing and Dave Ritchie on its tortious interference claim.

### d. Evidence Against Defendants J & L Distributors and Foster Qualls

Plaintiff presents evidence establishing the involvement of Defendant J & L Distributors but relatively little evidence that J & L Owner, Foster Qualls, was aware of the alleged buy-down scheme.[39] Most, if not all, of RJR's allegations with respect to Qualls are "upon information and belief." (RJR's Compl., ¶¶119, 120 , 127)

At the hearing, J & L, through counsel, admitted purchasing bought-down cigarettes from Appco but argued that Appco's sales to J & L ended when Jason Carpenter started R.J. Marketing, or no later than 2000.[40] (Tr. at 221-222 ; Blackburn Dep. at 228-29.) The only concrete evidence presented at the hearing contrary to J & L's position is a copy of an invoice dated September 9, 2003 from J & L Distributors billing Rogersville Tobacco Outlet for cigarettes and stamps. (RJR's Exh. 43 / "Invoice #24623") According to RJR, the invoice demonstrates that J & L, then directed by Qualls, was selling its discounted product at a price greater than that reflecting 100% of the buy down.[41]

---

[39] In its reply brief, RJR claims that Qualls knew of the terms of RJR's Retail Partner Marketing Contracts from his earlier dealings on behalf of another retail store, Overbrook. (RJR's Reply Brf. at 18, n. 14)

[40] R. J. Marketing has been in existence since 2000. However, Blackburn's testimony and the relevant documents establish that Appco sold bought-down RJR product to J & L for the first time in 2002. Therefore, it appears Carpenter was still with J & L through 2002.

[41] The evidence tends to show that by September 2003, Carpenter was operating R. J. Marketing and no longer associated with J & L.
Further, Defendants imply that a sales price higher than the buy down price does not necessarily mean that less than 100% of the buy down money was passed along to the consumer. Defendants argued that because the retailer may elect to forego one of the other financial incentives offered by RJR or reduce its profit margin, the end result may be the same. According to RJR, the sale price is suspicious if it falls at a price point in between the wholesale and bought-down retail prices.

Until recently, Blackburn's testimony was essentially the only evidence linking J & L (as opposed to Carpenter individually) to the alleged buy-down scheme.[42] However, on January 29, 2007, Plaintiff provided additional evidence to the Court relevant to J & L and Qualls in the post-Carpenter era.[43] During discovery, J & L and Qualls admitted in the January 5, 2007 Response to Plaintiff's First Set of Interrogatories that J & L "bought and sold bought-down R.J. Reynolds brand cigarettes from 2003 to 2005." (RJR's 1-29-07 Letter, Tab 4) J & L and Qualls also admitted engaging in multiple cash transactions of 5-carton purchases in order to obtain bought-down RJR cigarettes. (Id.) In light of Defendants' recent admissions, Plaintiff demonstrates a likelihood of success on the merits with respect to J & L and Foster Qualls.

### C. Public Interest

Plaintiff claims the public interest favors granting relief because consumers will benefit from an injunction ensuring that 100% of RJR's cigarette discounts are passed on to the adult consumers as intended. Defendants contend that public interest is a neutral factor, and in any event not determinative.

---

[42] Blackburn testified that he recognized Qualls' name but was unsure of Qualls' connection, if any, to J & L. (Blackburn Dep. at 124.) Thus, Blackburn's testimony tended to show that Blackburn dealt strictly with Carpenter. Blackburn also testified that the 2003 invoice was not correct because he was unaware of any sales to J & L in September 2003. (Id. at 228.) Blackburn agreed with counsel for RJR that it was possible the 2003 transaction was initiated by Carpenter on behalf of R.J. Marketing but the accounting department may not have corrected the internal data (previously showing Carpenter as a representative of J & L Distributors) to reflect R.J. Marketing as the actual purchasing entity. (Id.)

[43] Because the additional evidence does not alter the Court's analysis or ruling with respect to the other Core Defendants, the Court need not include the additional evidence.

## V. Order

1) Plaintiff's Motion For Preliminary Injunction is **GRANTED in part** and **DENIED in part** consistent with the terms and conditions of this Memorandum and Order;

2) Previously Contracted Retailer Defendant Market Basket is enjoined from purchasing RJR bought-down cigarettes from anyone, including but not limited to any wholesaler or retailer;

3) Fourth-Tier Wholesalers Dave's Distributing and J & L Distributors are hereby enjoined from:

    a) purchasing RJR bought-down cigarettes from anyone, including but not limited to any wholesaler or retailer

    b) selling RJR bought-down cigarettes to anyone, including but not limited to any wholesaler or retailer

4) Individual Defendants Daniel Blackburn, Stephen Hunt, David Ritchie, and Foster Qualls are enjoined from engaging in this type of conduct through any other business entities; and

5) The parties shall resubmit the relevant portions of their Certification of Initial Attorneys' Conference with revised dates for the Case Management and Pretrial Scheduling Order **no later than Friday, February 16, 2007**.

**SO ORDERED**.

           Signed: January 30, 2007

           Richard L. Voorhees
           United States District Judge